BLANCHE G. HAYWARD and BRUCE GREEN,

*vs.*

RUTH G. GREEN.

*New Castle, October 20, 1948.*

*Stewart Lynch,* of Lynch & Herrmann, and *Florence E. Freeman,* for plaintiffs.

*Percy Warren Green,* for defendant.

SEITZ, Vice-Chancellor: The issue here is whether the defendant took title to a certain farm absolutely, or subject to an agreement to hold for the benefit of certain of her brothers and sisters.

George Green, Sr. (hereinafter called the "testator") died March 5, 1943, leaving to survive him his wife, Catharine E. Green, five sons, Ernest L. Green, John Green, George Green, Jr., Frank Green and Bruce Green, and four daughters, Esther Green Stone, Catharine E. Sweeney, Ruth Green, and Blanche Green Hayward. One daughter of the testator, Gwen Green Hobson, predeceased him leaving to survive her a daughter, Emma Catharine Hobson, who was living at the death of the testator.

The testator left no personal estate and his real estate consisted of one farm which is the subject matter of this controversy. Under Item Third of his will, which was executed March 31, 1930, he devised the farm to the Farmers' Trust Company of Newark, in trust to pay the net income to his wife Catharine E. Green for her life, and upon her death to pay over and distribute the balance in equal shares to and among his children, identifying them by name. Pursuant to statute, Emma C. Hobson, a granddaughter, received her mother's interest.

Catharine E. Green, the widow of the testator, died intestate on July 18, 1943—about four months after her husband. Shortly thereafter, the defendant, Ruth G. Green, was appointed the administratrix of both her mother's and her father's estates.

The evidence is in dispute as to the value of the farm at the time of the testator's death, and also as to the amount of the testator's obligations. The petition for the probate of his will listed the farm as having a value of $11,950 and outstanding obligations of $9,560.47. The inventory and appraisement showed its fair value as $10,000.00.

By a deed dated August 16, 1943, all the living children of the testator,[1] plus the one grandchild, purported to transfer the property to the defendant Ruth G. Green without any pertinent limitations for a recited consideration of ten dollars and other valuable considerations. The notarial acknowledgements of the signatures on the deed indicate that some of the children signed the deed as late as September 24, 1943. Thereafter, by deed dated October 19, 1943, the Farmers' Trust Company as trustee also conveyed the farm to Ruth Green, the defendant, without any pertinent restrictions for a recited consideration of five dollars.

This deed recites in part:

"The said Farmers' Trust Company of Newark, Trustee as aforesaid, has not assumed any of the duties as such Trustee as there was no income from said real estate during the lifetime of the said widow, Catharine E. Green. The said Trustee executes and delivers this Deed unto the said Ruth G. Green, pursuant to the authority invested in it by Item Fourth of said last Will and Testament, and subject to the debts of the Estate, which are liens against the property hereinabove described, amounting to approximately the sum of Ten Thousand Dollars ($10,000.00), which the Trustee believes is a fair value for said property. The said George Green died without leaving any personal estate.

"The Heirs-at-Law and legatees and devisees under the last Will and Testament of the said George Green, deceased, have also executed and delivered unto the said Ruth G. Green, a deed coneveying all of their right, title and interest in the hereinabove described property, which was all of the real estate owned by the said George Green at the time of his decease."

The defendant, Ruth Green, has continued to live on

---

[1] The wife of one of the children signed later for a cash consideration.

the farm. Another daughter, Catharine, also lived on the farm for a time after the mother's death. In the early part of 1948, the defendant contracted to sell the farm free of any trust obligation. She advised the plaintiffs that she did not recognize any trust obligations with respect to the farm. Plaintiffs thereafter brought this action to impress a trust on the farm property for the benefit of the beneficiaries under the will of the testator. They base their right to relief on an alleged oral agreement made between the defendant and the plaintiffs, as well as some of their brothers and sisters. They contend that in return for the conveyance to her the defendant agreed she would hold the farm until its value increased and then sell it and distribute the net proceeds as provided in the testator's will. The defendant denies that she made any such agreement. She contends that she purchased the farm by obligating herself to pay her father's debts.

When the testator died in 1943, he was admittedly in a poor financial condition, and while the parties are in some disagreement as to his equity, if any, in the farm, it does appear that at best he had only a small equity in it.

Immediately after the testator's death in March of 1943, the settlement of his estate was a subject of much discussion among his widow and children. He was heavily indebted and his farm was his sole asset. There was an understandable desire on the part of some of the children to keep the farm because it had been in the family, but principally because the testator's widow desired to live out her life there. Admittedly, several ideas were discussed for working out the affairs of the testator in such a way that the farm might remain in the family. Since the testator left no personal estate, it was apparent that the farm would have to be sold to pay his debts unless some other arrangement could be worked out with his creditors. Before anything tangible was accomplished, the testator's widow died. The defendant testified that she thereupon lost interest in her contemplated

plan to obtain the farm so that her mother might remain there.

Upon the death of the widow, the question of solving the testator's affairs became more acute and the children discussed once again some means of working out the problem. The parties are in disagreement as to how the defendant, Ruth Green, came ultimately to take title to the farm. The record certainly is not clear, although the defendant indicates that her brother Bruce—a plaintiff—persuaded her to take it against her attorney's advice. The plaintiffs testified that Ruth took title to the farm pursuant to an agreement with at least some of her brothers and sisters that she would hold title to aid in settling her father's estate. They say she agreed that if they would convey their interest to her, she would hold the same subject to the terms of her father's will, and if and when the property was sold she would distribute the amount thereof in accordance with the testator's will, after deducting any payments made to his creditors. The defendant denies that she made any such agreement, and points out that the property was then worth little if any more than the amount of the debts which were against it. The record shows that the defendant actually paid about $4,000 in debts and assumed the mortgage debt which with interest aggregated $5,300. The question of the so-called Buckingham judgment is not clear, and I do not regard it as materially affecting the decision in this case, since it was not even then a lien against the farm and its validity apparently was seriously questioned.

Before discussing the evidence as to the existence of an agreement between the defendant and some of her brothers and sisters with respect to the farm, one other matter requires consideration. The children first signed a deed conveying title to the defendant and then the Farmers' Trust Company of Newark purported to deed the farm to the defendant pursuant to a recited sale. The reasons given for this rather unusual procedure are conflicting and vague. However, I am clear that the Bank as trustee did

little more than take the advice of the defendant's attorney. As a matter of fact the defendant's then attorney[2] testified that he prepared both deeds and caused the Bank to execute the second deed. Consequently I do not view the defendant as an independent purchaser from the trustee. In fact, the Bank relied upon the earlier deed of the children to the defendant as the basis for executing its deed.

Now to the merits. This is not an easy case. It is my duty to attempt to reconstruct the events which occurred during the period when the deed to the farm was executed by the defendant's brothers, sisters and niece.

The Greens were not a happy family. Feuds and quarrels between different members of the family seem to have existed for years. It is obvious from the testimony that several of the children entertained no particular affection for the defendant and this feeling was reciprocated. I must emphasize this unhappy situation because it throws some light on my approach to the problem here involved.

When the mother of these children died a few months after her husband, it is apparent that thereafter the only thing many of her children had in common was their possible interest in the Green farm. Each had been left the same interest in the farm under the father's will.

There was testimony to the effect that at least some of the children were told by a real estate man after their mother's death that if the farm was held for a short period, it could be sold at a substantial increase in value. Its possibility as a site for a housing development was also mentioned. The possession of such knowledge may well have influenced some of the children in their subsequent conduct.

The defendant testified that her brother Bruce, one of the plaintiffs, persuaded her to take title to the property. Indeed, he went with her to her lawyer's office, and it was at that time, she says, he persuaded her to take the prop-

---

[2] It was not the defendant's attorney in this action.

erty. Her testimony is somewhat evasive as to whether or not she authorized her attorney to draw a deed at that time. Under stress she finally conceded that she did. She says she told him some of her brothers and sisters, Blanche especially, would not sign. Bruce assured her that he would get the signatures.

Bruce Green's version of what took place in the attorney's office cannot be reconciled in many respects with the defendant's testimony and that of her attorney. From my observation of Bruce Green and from the testimony in general, I infer that he was not the type who would "put himself out" to help his sister Ruth unless, in the contemporary vernacular, he was going to "get something out of it" for himself. I cannot understand why he would go to all the trouble he did to secure the signatures on the deed to the defendant merely to see that she got absolute title. He was in no way liable for any of his father's debts, and his only apparent motive was the possibility of some gain.

It is undisputed that all the brothers and sisters and the niece assented to the transfer of the farm to the defendant without receiving any consideration. The recital in the first deed of consideration passing to the brothers and sisters may, therefore, be ignored. But the defendant says she assumed her father's debts in return for the transfer of the farm, and that the debts were at least equivalent to its then value. But why take the farm under those conditions when her mother was no longer living. She says Bruce persuaded her to take the property despite her attorney's advice to the contrary. She does not say what reasons he gave for persuading her, and why he went to the trouble to promise to secure the signatures of some of his brothers and sisters. I cannot believe that love and affection was Bruce's sole concern.

Bruce apparently made several trips to the farm as well as to the homes of some of his brothers and sisters and made several telephone calls in order to have them sign the deed. The defendant had nothing whatever to do

with the procuring of the signatures of some of the children. Bruce procured their signatures through unrelenting effort.

I am fully persuaded that the other plaintiff, Blanche Hayward, would never have signed over the property to the defendant unless she thought she would benefit thereby. Her feeling toward the defendant was and is such that, if she was not to profit, she would have preferred a sheriff's sale to any unrestricted transfer to the defendant. From her testimony I gained the distinct impression that any appeal by or on behalf of the defendant to have the property transferred to her absolutely, based on family ties, would have fallen on deaf ears. Her assent, in my opinion, can only be explained by the existence of some possibility of securing some ultimate financial benefit. The testimony of Blanche Hayward—whose reciprocated disaffection for the defendant appears to have existed for years—indicated quite clearly that she was signing pursuant to an agreement whereby the net proceeds would be distributed in accordance with the terms of her father's will. No attempt was made to shake her testimony. Under these circumstances the following testimony of the defendant is well nigh incredible:

"Well, I wasn't much interested—I wasn't interested at all in the property after mother died, and I made that known, so of course Bruce and the rest of them seemed to think it would be nice for me to buy the property and hold it for my home."

The testimony of the brothers Frank, George and John indicate that they did not believe they were conveying the property without any strings attached. John Green said he understood the defendant was taking the property as "guarantor". George said he thought he was signing a "power of attorney" so that a deed might be executed. Frank Green testified that he understood it was being deeded to keep it from a sheriff's sale. None of these brothers appeared to have any distinct understanding with respect to the matter, except that I have the clear impression that all thought that there was a plan for the benefit of all. None

of them appeared to possess particularly keen intellects. The evidence indicates that with two exceptions the interested persons were not particularly concerned with helping the defendant except to the extent that they might in turn benefit.

We come now to the role played by brother Ernest in this troubled drama. His version of the matter follows:

"Q. Following your mother's death were there any conversations in which you were a party where the subject discussed included or covered any transfer or deed of the property to anyone? A. Yes, sir.

"Q. When did that conversation take place and who was present? A. That was between my sister Ruth and myself, either on the day of my mother's burial or the following day.

"Q. Where did that conversation take place? A. At the old home in Newark.

"Q. Who said what about this transfer, or proposed transfer? A. That discussion was between Ruth and myself, and I don't recall whether there were any of the others present at the time. I think it was being discussed generally that day that she in substance would take the place over and carry out the trusteeship, or as she put it, in the interest of the younger children and particularly one younger brother."

The deed which the children signed was first sent for signature to Ernest in West Virginia. Ruth wrote a note to Ernest enclosing the deed and her attorney's letter to her when he sent her the deed. Her note to Ernest is not in evidence, and no attempt was ever made by defendant up to the time of the trial to see if it was in existence. The attorney's letter to the defendant and the deed, both of which the defendant sent to Ernest, are in evidence because they were both ultimately returned to the defendant. The defendant's attorney makes much ado about the absence of this note because the defendant testified that she explained the absolute nature of the conveyance to Ernest in this note. Ernest testified that the note stated the agreement was as "we understood it and had discussed it." In view of my subsequent conclusions, I am inclined to reject the defendant's testimony in this respect.

Defendant also relies upon the letter which her attorney wrote her when he transmitted the deed and which she sent to Ernest along with the deed. She points out that in this letter her attorney said that "Enclosed you will find Deed of your brothers and sisters conveying to you your Father's farm." This letter obviously does no more than state the substance of the recital in the deed itself and leaves untouched the question as to whether the conveyance was or was not subject to some extraneous agreement. Under the circumstances, I am not inclined to give this letter any particular weight. Indeed, if we are to rely upon the statements dealing with this transaction, made by the defendant's then attorney, it is more pertinent to point out that by letter dated November 17, 1943, the defendant's attorney wrote to one of the testator's creditors enclosing defendant's check in payment of the debt and stated "I want to thank you on behalf of Mrs. Green in making it possible for her to retain the farm belonging to her father's estate." This language is somewhat indicative of the fact that some time after the deeds were executed in favor of the defendant, her attorney spoke of the farm as "belonging" to her father's estate.

Rather than rely on the foregoing rather fragmentary written evidences of intent, I prefer to give weight to a copy of a letter dated August 6, 1943. The original of this letter was sent to the defendant by her brother, Ernest, and the defendant does not deny receiving it. This letter was apparently in reply to a letter received from the defendant in which she enclosed waivers for his signature. These waivers were obviously so that she could act as administratrix of her mother's and her father's estates. Because of the importance of this letter, I shall quote it at length:

"Weirton, West Virginia.
"August 6, 1943.

"Dear Ruth:

"Returning to Wellsburg last evening, I was pleased to find your letter and the waivers enclosed for my signature. It was good to know

that you are regaining possession of yourself, that things are moving along alright at home, and that you started action on what appears to be a workable plan, in the matters of the estate.

"Before leaving Newark following Mother's Burial, I did try to make my position in the matter of the estate clear, and I came away with the feeling that, at least, Bruce and yourself fully understood that position, namely, that since you two were the oldest of the family at home, and in possession of greater knowledge of the entire situation, and in the better position to execute a soluble plan for the eventual liquidation of the estate, that when either one of you, or both, spoke, you would also be speaking for me, and to that end I would tender my full support or contribution wherever and whenever needed. May I here and now emphasize that position and furthermore express my ardent hope that each and every sister and brother of our family do likewise, without suspicion, bickering and delay. Since the start of the War, my freedom of action regarding travel eastward, has been limited, but, should my presence over there be necessary at any time, in support of your plan, I will be there at your call.

\* \* \* \* \* \*

"I am enclosing a copy of this letter to Bruce in order that each of you have it, should you need it, meantime, I sincerely hope you will get the full co-operation to your plan by all concerned."

The letter was written shortly after the death of the mother and at a time when there was no dispute over title to the farm. It obviously indicates that Bruce, Ruth and Ernest at least had discussed a "workable plan" for the eventual liquidation of their father's estate. The letter indicates that Ernest was not surprised to receive the waivers in favor of his sister Ruth, and it further indicates that the "workable plan" had been discussed after their mother's death. The fact that the defendant became administratrix very soon after her mother's death, pursuant to waivers signed by the others, is inconsistent with her alleged lack of interest in the farm, and with her testimony that she later decided to take title to the farm.

The defendant says that this letter has reference to a plan which was under consideration prior to their mother's death, but the tenor of this letter, referring as it does to a discussion subsequent to their mother's death, compels me to reject the defendant's explanation of this letter. As-

suming that the same plan was discussed, as it may have been, prior to the mother's death, nevertheless, I feel that these parties adopted it after her death. I believe that Bruce and the defendant had agreed upon a plan for the liquidation of the estate, at least in its broad outlines, at or before the time the defendant and the plaintiff Bruce visited the office of the defendant's attorney. Bruce in so doing was also speaking for Ernest and, as other testimony shows, for most of the other children, since the defendant left it to Bruce to procure certain signatures. The defendant's attorney sent the deed to the defendant to have it executed with a letter dated August 21, 1943.[3] These facts cast some doubt on the defendant's veracity when she states that she had lost all interest in the farm after her mother's death, and that Bruce persuaded her to take the farm outright while they were visiting the office of the defendant's attorney. The letter written to the defendant by Ernest indicates that the defendant had certainly not lost all interest in the farm immediately after her mother's death.

The letter also indicates that Ernest, Bruce and the defendant expected some difficulty with at least some of the other children in procuring assent to the plan. The testimony clearly indicates that Bruce had to take the laboring oar to sell the plan to some of the other brothers and sisters. The defendant herself spoke to the others. This is consistent with the troublesome intra family relationships.

The defendant's attorney emphasizes the fact that the property was apparently worth little more than the amount of the testator's obligations. However, I think it reasonable to conclude that the parties felt that the farm could be held for a reasonable period and sold at a substantial increase in value. Moreover, it is obvious that many of the brothers and sisters would never have consented to

---

[3] The date of the acknowledgments to some of the signatures on the first deed as well as the deed itself is August 16, 1943. This date is quite palpably erroneous since the deed was not sent to the defendant by her attorney until later.

any plan whereby the property would be transferred to the defendant if they felt at that time they had any substantial equity in it. Obviously, they would have preferred a sale and a distribution of the net proceeds in accordance with their father's will. Consequently, the fact of the existence of only a small equity in the farm in favor of the father's estate at the time of the mother's death is not inconsistent with the existence of the plan under which the plaintiffs claim the farm was deeded to the defendant.

The defendant's sister Esther, who lived in Virginia at the time the questioned transaction took place, testified that she intended to deed her interest outright. Emma C. Hobson, the defendant's niece, testified that she conveyed her interest outright to the defendant. Without elaborating on the testimony of these two witnesses, it is sufficient to say that neither was aware of the circumstances whereby the other children executed the deed to the defendant. It is apparent that both would have transferred their interest no matter how substantial their equity in the farm might have been. However, since they have both testified that they transferred their interest outright, it follows that no trust in their favor can be imposed on the property.

The testimony of the various children is not always consistent, but it is apparent that much of the inconsistency is explained by the fact that the negotiations were not always carried on by the defendant, and also by the fact that some of the children are possessed of untutored minds. While Bruce's testimony and the testimony of the defendant's then attorney are in some respects inconsistent, nevertheless, I feel that the defendant took the farm pursuant to the agreement I have found. Whether they so advised the defendant's attorney, I need not decide. Her attorney was merely putting into effect a device whereby the pressing problems of the estate could be settled. The future of the transaction was not his concern. The defendant's agreement with Bruce and Ernest, at least, contemplated the possibility that they would assist the defendant in paying the obligations of the

estate. However, the defendant never requested any assistance from them. Parenthetically, at this time she did receive a thousand dollar loan from her brother-in-law Louis Hobson, which she subsequently repaid.

A discussion of the many facets to this dreary case would prolong this opinion beyond reason. I, therefore, desist from a further discussion of the testimony. It is my conclusion that the defendant took title to the farm pursuant to an explicit understanding with Bruce, Ernest and Blanche that she would hold the farm until it could be sold at a profit; that she, with the help of Bruce and Ernest, would arrange to pay the testator's obligations against the farm; and that upon its sale she would, after receiving credit for any such payments, distribute the net proceeds in accordance with her father's will. I believe her brothers George, John and Frank and her sister Catharine signed pursuant to an understanding that they were not conveying the property outright. While the evidence indicates that no such specific agreement was spelled out with them, it does appear that they were definitely led to believe by the defendant, or Bruce speaking for her as well as himself, that the defendant was taking the property to protect the interest of all. Considering the understanding entertained by George, John, Frank and Catharine when they signed the deed, and considering their lack of intellectual keenness, I feel that it would be inequitable to treat them other than as beneficiaries of the agreement made by the defendant with Bruce, Ernest and Blanche. I believe the defendant was well aware that they were not making a gift of whatever interest they had. Since her sister Esther and her niece Emma have testified that they made no agreement with the defendant, it follows that my conclusion does not apply to the interests conveyed by them.

In view of my conclusions, the defendant must be found to hold the property subject to the recited agreement with the enumerated brothers and sisters. Since she has denied its existence, a trust in accordance with its terms must be

impressed upon the property. I think the finding of such an agreement, entirely repudiated by the defendant, when coupled with the fact that the defendant was not only a sister but the administratrix of the father's estate, and the only one represented by an attorney are sufficient to support my conclusion. The fact that the farm was liable for the testator's debts gave the defendant as administratrix a real interest in the farm in two capacities. This combination of circumstances amounts in my opinion to at least bad faith on the part of the defendant in claiming the entire farm for herself. This basis for impressing a trust on land was recently recognized by this court. See *Greenly v. Greenly,* 29 *Del. Ch.* 297, 49 *A.* 2*d* 126.

Ernest Green, Bruce Green, George Green, Jr., John Green, Frank Green, Catharine Sweeney and Blanche Hayward will each be declared to have a one-tenth interest in the George Green farm. However, these interests will be made subject to appropriate instruments entitling the defendant to payment in full with interest for all payments made on behalf of the estate of George Green, plus other disbursements which benefited the interests of all. The release of dower executed by Amanda Green will remain unimpaired.

An order accordingly will be advised on notice.